*628 Opinión concurrente en parte y disidente en parte de la
Juez Asociada Señora Rodríguez Rodríguez, a la cual se une la Jueza Asociada Oronoz Rodríguez.
Hoy se sanciona desmedidamente a un integrante de la profesión legal que, si bien incurrió en faltas éticas, cuenta con el beneficio de una trayectoria profesional laudable en el servicio público de nuestro País. Es por ello que disiento de la sanción impuesta.
Tras concluir que el Ledo. Rafael Capella Angueira incurrió en conducta contraria a las exigencias de los Cánones 1, 9, 12 y 18 del Código de Ética Profesional, 4 LPRAAp. IX, una mayoría de este Tribunal ordena suspenderlo del ejercicio de la abogacía por un término de tres meses. A pesar de que estoy de acuerdo con la determinación de que el licenciado Capella Angueira cometió las faltas éticas que se le imputan y que, por lo tanto, procede que este Tribunal le imponga una sanción disciplinaria, estimo que la medida adoptada por una mayoría de este Tribunal es, a la luz de los hechos y circunstancias del caso, y los intereses que el proceso disciplinario tutela,(1) excesiva y, en última instancia, desproporcionada en comparación con la gravedad de las faltas cometidas.
No existe controversia en torno a los hechos que dieron origen al procedimiento disciplinario de *629 marras.(2) Tras la correspondiente evaluación de éstos y un análisis de los planteamientos elaborados por las partes implicadas en sus respectivas comparecencias, este Tribunal concluye que el licenciado Capella Angueira incurrió en violaciones a los deberes éticos contenidos en los Cánones 1, 9, 12 y 18 del Código de Ética Profesional, 4 LPRA Ap. IX. Como indiqué, no existen mayores divergencias de criterio entre los miembros de este Tribunal con respecto a esta determinación. Lo que ha generado diferencias, y la razón por la cual me veo obligada a disentir, se limita a la sanción que corresponde imponer en atención a esas violaciones.
Contrario a otras jurisdicciones, nuestro ordenamiento disciplinario es silente con respecto al tipo de sanción que procede luego de una determinación de que un integrante de la profesión legal ha transgredido una, o varias, de las nor-mas que regulan el ejercicio de la abogacía. Dicho de otra manera, en nuestro Código de Ética Profesional, “las sanciones no están predeterminadas por tipos de infracción” y, por lo tanto, “[n]o existen categorías de faltas con las correspondientes categorías de sanciones aplicables”. S. Steidel Figueroa, Etica y responsabilidad disciplinaria del abogado, San Juan, Pubs. JTS, 2010, pág. 368. Lo cierto es que, al amparo de los preceptos sustantivos y procesales vigentes, este Tribunal goza de un alto grado de discreción al momento de determinar la sanción correspondiente a una violación de índole ética, asunto que algunos comentaristas lo tildarían de excesivo.
Ahora bien, en teoría, esta laguna se subsana mediante la aplicación sistemática y ponderada del precedente judicial. Así, “las sanciones pudieran considerarse como predeterminadas para casos futuros análogos a los previa *630 mente resueltos por el Tribunal”. Steidel Figueroa, op. cit, pág. 368. Lamentablemente, este Tribunal no ha sido consistente en el ejercicio de sus prerrogativas disciplinarias. Esta tendencia podría explicarse de dos maneras. Por una parte, la inconsistencia podría atribuirse a una falta de interés en atender con el rigor necesario los asuntos relacionados con conducta profesional. Esto podría explicar, a su vez, el hecho de que nuestro Código de Ética Profesional haya permanecido virtualmente inalterado por más de cuatro décadas.(3) De otra parte, en la práctica hemos claudicado a nuestro deber de exteriorizar cabalmente el racionamiento colectivo o individual detrás de las adjudicaciones en los méritos de los asuntos disciplinarios ante nuestra consideración. Ciertamente, son pocas las instancias en las que este Tribunal ha llevado a cabo un análisis comparativo de conductas análogas evaluadas en casos anteriores.(4)
Esta imprecisión e insuficiencia al momento de descargar nuestras funciones disciplinarias, por las que respondemos todos los integrantes de este Foro, afecta de manera directa a los miembros de la profesión legal y tiene graves consecuencias en nuestro ordenamiento disciplinario. La principal es que despoja a éste del grado de coherencia y consistencia que requiere para que sea plenamente efectivo. Si bien la consistencia en las decisiones dictadas por este Tribunal Supremo no constituye una garantía absoluta sobre su corrección, resulta ser un elemento de gran importancia, puesto que no solo confiere estabilidad, confiabilidad y credibilidad a nuestro sistema de justicia, sino que, desde un punto de vista institucional, asegura que todos sean juzgados de forma uniforme y según las mismas reglas. Después *631 de todo, “[l]a estabilidad, la certeza, la eficacia y la reducción de arbitrariedad en la toma de decisiones judiciales son valores axiomáticos del Derecho y de un sistema de justicia objetivo y confiable”. Rodríguez et al. v. Hospital et al., 186 DPR 889, 927 (2012), opinión concurrente y disidente de la Juez Asociada Rodríguez Rodríguez.
La importancia de la consistencia adquiere mayor relevancia en el contexto disciplinario, puesto que, en casos de suspensiones y separaciones permanentes del ejercicio de la abogacía, éstas inciden directamente en la fuente de sustento de muchos profesionales del Derecho. Por esta razón, su determinación es un asunto que exige profunda atención y deliberación, y se rige por las garantías del debido proceso de ley. Asimismo, el ejercicio de nuestra jurisdicción disciplinaria exige que indaguemos en torno al propósito de las sanciones que imponemos y su relación con la conducta que se quiere disuadir.(5) Es decir, supone un juicio informado de proporcionalidad, el cual ha de tomar en consideración las múltiples circunstancias concomitantes a la conducta evaluada. No debemos pasar por alto, además, que las consecuencias de una sanción disciplinaria no son meramente económicas; el prestigio y la reputación del profesional del Derecho al que este Tribunal sanciona también se afectan significativamente.
II
Según se deduce de los hechos reseñados en la Opinión per curiam que antecede, la directriz emitida por el licen *632 ciado Capella Angueira representa el aspecto más significativo de la conducta que nos corresponde evaluar. Sin duda, la referida directriz constituyó un craso error de juicio por parte del licenciado Capella Angueira que no se justifica y que, por el contrario, merece nuestro más enérgico rechazo. No obstante, un entendimiento integral de los hechos y un estudio sosegado y sin ánimo prevenido del expediente profesional del licenciado, me hacen discrepar del criterio mayoritario en cuanto a la sanción impuesta, a saber: suspensión temporera del licenciado Capella Angueira del ejercicio de la profesión legal. Máxime, cuando hace menos de dos meses la mayoría que hoy suspende al licenciado Capella Angueira optó por meramente apercibir a una funcionaría que al día de hoy ocupa un puesto en la legislatura de nuestro País, de que en el futuro debía ser más “rigurosa” en su facturación por el trabajo rendido.(6) Hoy, por el contrario, la mayoría opta por imponer la sanción más inclemente; la de suspender de la profesión legal a un verdadero servidor público quien, por más de tres décadas, ha provisto servicios legales de primer orden a los más necesitados. Y quien ha antepuesto, consecuentemente, los intereses de sus clientes a cualquier utilidad económica, profesional o política que pudiese derivar de sus funciones. La suspensión del licenciado Capella Angueira *633 priva, además, a un sector marginado de nuestra población de un líder comprometido con garantizar el reconocimiento de sus derechos en todo procedimiento criminal.
Por los fundamentos esbozados anteriormente, disiento de la sanción que hoy se le impone al licenciado Capella Angueira. Esto, por entender que no es cónsona con la conducta que se le imputa y no refleja una evaluación ponderada de los atenuantes que obran a favor del licenciado. Por mi parte, hubiese circunscrito la sanción a una censura enérgica acompañada de un apercibimiento general a efectos de que, en lo sucesivo, una conducta de la naturaleza en la que incurrió el licenciado Capella Angueira acarreará sanciones más severas.

 Es necesario destacar que, en el pasado, nos hemos expresado con relación a la naturaleza y función del proceso disciplinario. Véanse: In re Sánchez Ramos, 174 DPR 453, 467 (2008) (“[E]l norte de todo procedimiento disciplinario es proteger al público y a la profesión legal, por lo que toda pretensión ajena a dicho propósito no será motivo para que este Foro emprenda la delicada encomienda de sancionar disciplinariamente a un abogado”); In re García Aguirre, 175 DPR 433, 441 (2009) (“El fin del procedimiento disciplinario no es castigar al abogado, sino proteger al público y a la profesión legal mediante una investigación de las condiciones morales del letrado para determinar si puede continuar ejerciendo la abogacía”).

 En sus comparecencias ante este Tribunal, el licenciado Capella Angueira tampoco refuta los hechos esenciales que provocaron que se iniciara un procedimiento disciplinario en su contra. En éstos, el letrado más bien intenta contextualizar los mismos en un esfuerzo por demostrar que su actuación no contravino los estándares mínimos de comportamiento profesional que exigen los cánones del Código de Ética Profesional. En la alternativa, plantea que la presencia de varios atenuantes justifica que no se le sancione.

 Convido a mis compañeros y compañeras a aprovechar la coyuntura que supone la actualización, adecuación y atemperación de nuestro Código de Ética Profesional para incluir estándares claros que guíen nuestra discreción al momento de imponer sanciones. Esto en aras de evitar actuaciones arbitrarias o que creen la impresión de arbitrariedad al momento de ejercer nuestra jurisdicción disciplinaria.

 Véanse: In re Rivera Ramos, 178 DPR 651 (2010); In re González Acevedo, 165 DPR 81 (2005).

 En cuanto a la relación entre un estándar adjudicativo consistente y el propósito de las sanciones disciplinarias, en otras jurisdicciones se ha afirmado:
“Our purpose in imposing sanctions is to deter other lawyers from similar conduct; to assure the public that we will maintain the ethics of the profession; and to appropriately reflect our view of the attorney’s fitness to practice law. [...] The standard we apply tailors the circumstances of each case, giving respectful consideration to the recommendation of the commission and also taking into account our decisions in earlier similar cases”. Com. on Pro. Ethics & Conduct v. Baudino, 452 N.W.2d 455, 459 (Iowa 1990).

 En aquella ocasión, una mayoría de los integrantes de este Tribunal ordenó el archivo de una queja disciplinaria que involucraba imputaciones éticas serias, que consistían en irregularidades relacionadas con la facturación indebida a un municipio del Estado Libre Asociado de Puerto Rico. Estas imputaciones fueron producto de los señalamientos contenidos en un informe de auditoría de las operaciones fiscales del Municipio de Canóvanas que rindió la Oficia del Contralor de Puerto Rico. Al así proceder, la mayoría se limitó a un mero apercibimiento a la letrada en cuestión a los efectos de que, en el futuro, debía ser “sumamente rigurosa para asegurarse de que el contenido de sus facturas revel [ara] con corrección los detalles que requiere el cobro de honorarios por servicios legales prestados”. In re Charbonier Laureano, 193 DPR 409 (2015). Esto, a pesar de que los fondos en controversia eran, propiamente, fondos públicos.
Al valorar la severidad de la sanción que hoy se impone frente al archivo de la queja en el caso antes mencionado, parece acertada la crítica de que, en el ejercicio de nuestra jurisdicción sobre conducta profesional, “las sanciones disciplinarias parecen depender más de quién se trata y no de la conducta incurrida”. G. Figueroa Prieto, Conducta profesional, 74 Rev. Jur. UPR 495, 529 (2005).